IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| MICHAEL MUCY, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| vs | ) | Civil Action No. 20-1950 |
| | ) | |
| | ) | |
| TROOPER RICHARD NAGY and TROOPER | ) | Magistrate Judge Dodge |
| ZACHARY WEBB, | ) | |
| | ) | |
| Defendants. | ) | |

## <u>MEMORANDUM OPINION</u>

Plaintiff Michael Mucy ("Mucy") brings this civil rights action pursuant to 42 U.S.C. § 1983 against Defendants Richard Nagy ("Nagy") and Zachary Webb ("Webb"), both of whom were troopers with the Pennsylvania State Police. His claims arise out of an incident in which Defendants searched and seized his vehicle, as well as two firearms and ammunition found inside, after he refused to return to a Walmart parking lot where he had left his vehicle after an accident. Mucy further alleges that Defendants improperly issued citations to him for six summary offenses and made false statements to local officials, who then suspended him from his position as an elected constable of Redstone Township. He contends that these actions violated his constitutional rights under the First, Fourth and Fifth Amendments. He also asserts a state law claim for malicious prosecution.

Presenting pending before the Court are the parties' cross-motions for partial summary judgment. Defendants move for summary judgment with respect to the First and Fifth Amendment retaliation claims in Count I and the malicious prosecution claim in Count VII. Mucy moves for summary judgment with respect to his Fourth Amendment claim relating to the search of his vehicle and the seizure of his vehicle, the firearms and ammunition as set forth in

Count VI. For the reasons that follow, Defendants' motion will be granted in part and denied in part and Mucy's motion will be granted.[1]

## I.   Relevant Procedural History

Mucy commenced this action in December 2020. After Defendants filed a motion to dismiss, he filed an Amended Complaint (ECF No. 14). In addition to the claim of retaliation for the exercise of First and Fifth Amendment rights (Count I), the Amended Complaint also asserted federal claims of unlawful arrest (Count II), malicious prosecution (Count III), reckless investigation (Count IV), stigma-plus due process violation (Count V) and unlawful search and seizure in violation of the Fourth Amendment (Count VI), as well as a state law claim of malicious prosecution (Count VII). Federal question jurisdiction is based on the civil rights claims, 28 U.S.C. § 1331, and supplemental jurisdiction is asserted over the state law claim, 28 U.S.C. § 1367(a).

Defendants subsequently filed a motion to dismiss (ECF No. 17) the Amended Complaint. On August 3, 2021, a Memorandum Opinion and Order were filed (ECF Nos. 21, 22) which granted the motion in part and denied it in part. As a result, the remaining claims are as follows: retaliation in violation of Mucy's rights under the First and Fifth Amendments (Count I), improper searches and seizures in violation of his rights under the Fourth Amendment (Count VI) and malicious prosecution (Count VII).[2]

Defendants' motion for partial summary judgment with respect to Counts I and VII (ECF No. 35) has been fully briefed (ECF Nos. 36, 48) as has Mucy's motion for partial summary judgment with respect to Count VI (ECF Nos. 39, 40, 46).

---

[1] The parties have fully consented to the exercise of jurisdiction by a United States Magistrate Judge pursuant to 28 U.S.C. § 636(c)(1). (ECF Nos. 10, 11.)

[2] Counts I and VI are asserted against both Defendants, while Count VII is alleged only against Defendant Nagy.

II.    **Factual Background**

In the late evening hours on December 20, 2018, Mucy was returning to his home in Republic, Fayette County, Pennsylvania from his grandmother's residence in Charleroi, Washington County. He was driving a 2012 Dodge Charger and was traveling alone. (Plaintiff's Concise Statement of Material Facts ("PCSMF") ¶¶ 1-2, 7) (ECF No. 41); (Plaintiff's Response to Defendants' Statement of Material Facts ("PRDSMF") ¶ 14) (ECF No. 49).

Mucy was an elected constable of Redstone Township and as part of his official duties, had in his vehicle two firearms, ammunition, a duty belt and a badge. (PCSMF ¶ 16; Defendants' Concise Statement of Material Facts ("DCSMF") ¶¶ 5, 13 (ECF No. 37)).

That evening, the road conditions were wet and slippery due to rain. While Mucy was traveling on Route 40 in Washington County in his car, it came into contact with water on the roadway and hydroplaned. His vehicle left Route 40, traveled up an embankment, and then came back onto Route 40. When it came to rest, it was facing the wrong direction in the opposite lane of travel. No one was harmed and there were no other vehicles involved. Other than Mucy's car and grass on the embankment, no property damage was caused by the accident. (PCSMF ¶¶ 3-10.)

Mucy claims that his vehicle was still operable and describes the damage, which included a fender that was bent and loose and the discharge of the airbag, as minor. No windows were broken and the door locking mechanism worked. According to Mucy, the car was driving and riding fine. (*Id.* ¶ 11; PRDSMF ¶ 6.)

Defendants dispute these facts. Nagy observed the driver's side fender hanging off of the vehicle and a bent right rear wheel or axle. He described that the car was "not roadworthy." Webb concluded that it was not safe to operate the vehicle and believed it was a "reportable

crash, which would have been required to notify police that the crash had taken place." (DCSMF ¶ 6; Defendants' Response to Plaintiff's Statement of Material Facts ("DRPSMF") ¶ 11.) (ECF No. 45.)

Immediately after the incident, Mucy drove his car to parking lot of the Brownsville Walmart, which was a few hundred yards away. Although he asserts that the vehicle was operable, he decided to call a tow truck to have the vehicle towed rather than drive it further that night because it was the middle of the night and raining heavily. Before leaving Walmart, he made arrangements with Van Divner Towing to tow the vehicle and lock it inside their facility because his personal possessions, including two guns, ammunition, magazine, duty belt, handcuffs, shackles, paperwork and laptops, were inside. Mucy advised Walmart management of the situation and that he had made arrangements to have the vehicle towed. (PCSMF ¶¶ 12-17; DCSMF ¶ 7.)

Mucy got a ride home from a friend and a tow truck driver later arrived at the Walmart. (PCSMF ¶¶ 15, 19, 21.) At approximately 11:43 p.m. Nagy and Webb responded to the scene of what was characterized as a single vehicle accident. They noted that a 2012 white Dodge Charger had been moved to a nearby Walmart parking lot in Washington County on US 40. By the time they arrived, the driver had left the scene. (DCSMF ¶¶ 1-2, 4.) The tow truck driver was already there. (PCSMF ¶ 21.)

At approximately 11:50 p.m., Webb contacted Mucy by phone. Mucy identified himself as the driver of the white Dodge Charger. (DCSMF ¶¶ 8-9.) Mucy claims that Webb demanded that he return to the scene (PCSMF ¶ 19), although Webb does not remember using the word "demand." (DRPSMF ¶ 19). The parties agree, however, that Mucy stated during this phone call that he could not return to the scene of the accident that night. (DCSMF ¶ 10; PCSMF ¶ 20.)

At the direction of Nagy and Webb, the tow truck driver opened the vehicle using the key fob he had obtained from Mucy. (PRDSMF ¶ 11.)[3] Nagy states that he entered the vehicle in order to find paperwork confirming the vehicle's registration and Mucy's proof of insurance. Defendants contend that they first searched the glove compartment for his insurance information. When they found a firearm, they expanded their search to the entire vehicle as an "inventory search" for the purpose of safekeeping the firearms. (DRPSMF ¶ 22.) Two firearms, ammunition, and various other items, including a duty belt with a badge, were found in the vehicle. (DCSMF ¶¶ 12-13.) While Webb testified that he was one who entered the vehicle, Mucy contends that both Nagy and Webb conducted the search. (PRDSMF ¶¶ 12-13.) It is undisputed that they did not have a search warrant. (PCSMF ¶ 23; DRPCSMF ¶ 23.)

During this search, Defendants seized his two firearms and magazines. They had no reason to believe that he was illegally in possession of the firearms. (PCSMF ¶¶ 22-25.)

Defendants claim that they were unable to return Mucy's firearms to him that night because they had to respond to a priority call they had received while at the Walmart regarding a suicidal female. (DCSMF ¶ 14.) Mucy suggested that the police could stop by his house that evening because they would be driving past it, but they declined his offer. (PRDSMF ¶ 14.) Because his firearms, a .357 caliber Glock 32 semi-automatic pistol and a .380 caliber Kel-Tec semi-automatic pistol, were not returned to or retrieved by Mucy that night, they were entered

---

[3] Defendants state that the tow truck driver provided the keys to Nagy (DCSMF ¶ 11), but the record citation does not support this description of what occurred. Defendants also state that the search of the vehicle began during the telephone conversation, but the record citation similarly does not support this sequence of events. In fact, both Webb and Mucy testified that, during the conversation, Webb asked Mucy about the two guns found in his vehicle, which strongly suggests that the search had already occurred at that point. (ECF No. 38 Ex. F (Webb Dep. 8:1-9); Ex. H (Mucy Dep. 46:8-17.)) Nevertheless, the parties have analyzed the search and seizure and retaliation claims on the basis that the call occurred *prior* to the search, and the Court will analyze it accordingly.

into Pennsylvania State Police evidence on December 21, 2018 at approximately 3:30 a.m. (*Id.* ¶¶ 15-16.) There is no record indicating why they were entered into evidence. (*Id.* ¶ 15.) As reflected in the property record, Defendants also seized Mucy's ammunition. (ECF No. 38 Ex. B.)

According to Mucy, Defendants seized his vehicle and its contents by instructing the tow truck driver to impound the vehicle with a hold. (PCSMF ¶ 26.)[4] Defendants assert that they had the vehicle impounded in order to complete their investigation of the accident. (DRPSMF ¶ 26.)

Nagy spoke with Mucy by telephone on December 21, 2018 to confirm Mucy's account of the accident. (DCSMF ¶ 17.) The next day, Nagy filed the following summary citations against Mucy:

- Driving Vehicle at Safe Speed (MJ-27303-TR-0001775-2018);

- Driving on Roadways Laned for Traffic (MJ-27303-TR-0001776-2018);

- Careless Driving (MJ-27303-TR-0001777-2018);

- Reckless Driving (MJ-27303-TR-0001778-2018);

- Immediate Notice of Accident to Police Department (MJ-27303-TR-0001779-2018); and

- Duty to Give Information and Render Aid (MJ-27303-TR-0001780-2018).

(DCSMF ¶ 18; PCSMF ¶ 29.)

On December 26, 2018, Mucy was suspended from his position as a constable pending the outcome of the traffic summary offenses. (DCSMF ¶ 19.) Mucy claims that this occurred

---

[4] Webb testified that the vehicle was not towed to the state police barracks. (ECF No. 38 Ex. F) (Webb Dep.at 51:24-52:1.) Thus, it appears that the vehicle was held at Van Divner Towing, but Mucy was not allowed access to it. *See also* ECF No. 48 Ex. H (Mucy Dep. at 47:15-24) (Mucy's insurance company wanted to examine the vehicle, but Van Divner would not release it because of the hold placed on it by the state police).

after Nagy contacted multiple Fayette County officials, including Fayette County Common Pleas Judge Wagner, Magisterial District Judge Kasunic and the court administrator's office and falsely reported to them that Mucy had "fled the scene … to avoid a DUI" (ECF 48 Ex E) (Escalera-Rivera Dep. 13:19-20:10) and falsely told them that the car was "totaled" and in Belle Vernon custody (ECF No. 48 Ex. C) (Nagy Dep. at 67:12-13)). Nagy admits that there was no probable cause for a DUI charge. (*Id.* at 66:6-9.)

Nagy testified that he contacted Judge Wagner "[b]ecause I was advised that, when a county or commonwealth employee is involved in this type of incident, we more or less would contact a supervisor, just like we would do with an actual police officer or whatnot, to report those actions." (Nagy Dep. 63:20-24.)[5] When asked if he told Judge Wagner that Mucy was a DUI driver or that he had "fled through the woods after the incident," Nagy stated that he could not recall. (*Id.* at 65:1-4, 66:10-12.)

Mucy made multiple requests for the car and items to be returned to him.[6] While Defendants' investigation of the incident on December 20, 2018 was complete when Nagy filed the summary citations on December 22, 2018, Mucy's vehicle was not released from impound for at least thirty days after the incident. (PCSMF ¶ 28, 30-31.)

On February 12, 2019, all of the citations against Mucy were dismissed. On February 21, 2019, after Mucy's attorney sent a written demand, Nagy notified him that he could pick up his

---

[5] When asked who advised him to make this call, however, Nagy responded that he spoke with Corporal Newman, who "advised me who I could contact to report the incident." (ECF 48 Ex. C (Nagy Dep. at 64:8)). It is unclear whether Corporal Newman advised Nagy to make the call or merely indicated who Nagy could contact if he wished to make a call. (*See also id.* at 90:9-20 (Nagy stated that he could not recall whose idea it was to contact Judge Wagner, did not know if Corporal Newman instructed him to do so, and did not need Newman's permission to do so).

[6] Defendants attempt to dispute this statement, but their dispute is solely based on a citation to Nagy's deposition testimony that he did not recall receiving any of Mucy's phone calls, although he admitted that "I am not saying he didn't call" and that he "worked midnights a lot, so it would have been very easy for me to miss those phone calls." (DRPSMF ¶ 27.)

firearms and magazines. (PCSMF ¶¶ 32-33; DCSMF ¶ 20.) Mucy was reinstated as a constable on February 19, 2019. (DCSMF ¶ 21) and was able to retrieve his firearms and ammunition on March 11, 2019. (*Id.* ¶ 22; PCSMF ¶ 34.) Mucy never retrieved his vehicle, however, because his insurance company paid him for a total loss when it was unable to examine it. (ECF No. 48 Ex. H) (Mucy Dep. 48:2-49:11.)

## III.   Discussion

### A.   Standard of Review

The Federal Rules of Civil Procedure provide that: "The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). Summary judgment may be granted against a party who fails to adduce facts sufficient to establish the existence of any element essential to that party's case, and for which that party will bear the burden of proof at trial. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). The moving party bears the initial burden of identifying evidence which demonstrates the absence of a genuine issue of material fact. Once that burden has been met, the non-moving party must set forth "specific facts showing that there is a genuine issue for trial" or the factual record will be taken as presented by the moving party and judgment will be entered as a matter of law. *Matsushita Elec. Indus. Corp. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986). An issue is genuine only if the evidence is such that a reasonable jury could return a verdict for the nonmoving party. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). The Court of Appeals has held that "where the movant bears the burden of proof at trial and the motion does not establish the absence of a genuine factual issue, the district court should deny summary judgment even if no opposing evidentiary matter is presented." *National State Bank v. Federal Reserve Bank,* 979 F.2d 1579, 1582 (3d Cir. 1992).

In following this directive, a court must take the facts in the light most favorable to the non-moving party and must draw all reasonable inferences and resolve all doubts in that party's favor. *Hugh v. Butler County Family YMCA*, 418 F.3d 265, 266 (3d Cir. 2005); *Doe v. County of Centre, Pa.*, 242 F.3d 437, 446 (3d Cir. 2001).

**B.  Mucy's Motion for Partial Summary Judgment**

Mucy's civil rights claims are asserted under 42 U.S.C. § 1983. Section 1983 "is not itself a source of substantive rights, but a method for vindicating federal rights elsewhere conferred by those parts of the United States Constitution and federal statutes that it describes." *Baker v. McCollan*, 443 U.S. 137, 144 n.3 (1979). "The first step in any such claim is to identify the specific constitutional right allegedly infringed." *Albright v. Oliver*, 510 U.S. 266, 271 (1994). *See also Baker*, 443 U.S. at 140; *Graham v. Connor*, 490 U.S. 386, 394 (1989). As noted above, Mucy's claims are asserted under the First, Fourth and Fifth Amendments.

Mucy moves for summary judgment with respect to his Fourth Amendment claims in Count IV that arise out of the search and subsequent seizure of the vehicle, his firearms and ammunition, as well as the length of time they were held in police custody. He contends that, at each step of the process, Defendants acted without a warrant and possessed no recognized exception to the warrant requirement.

1.  Search and Seizure Claims

The Fourth Amendment protects people's right "to be secure in their persons, houses, papers and effects, against unreasonable searches and seizures…" *Brown v. Muhlenberg Township*, 269 F.3d 205 (3d Cir. 2001). The Third Circuit has held that an individual challenging a search has the burden of establishing that he had a reasonable expectation of privacy in the property searched and the items seized and must show both that he had a subjective expectation

of privacy in the area searched and that his expectation was objectively reasonable. *United States v. Burnett*, 773 F.3d 122, 131 (3d Cir. 2014) (internal citation omitted). "To demonstrate that he had a subjective expectation of privacy, the defendant must show that he 'took normal precautions to maintain his privacy.'" *Id.* (citation omitted).

Here, Mucy locked his vehicle and gave the keys to a tow truck driver to transport it safely from the Walmart parking lot. One firearm was locked in a compartment in the front of the vehicle and the other was locked in the trunk. Defendants do not dispute that Mucy took normal precautions to maintain the privacy of his vehicle and its contents.

The Supreme Court has held that "searches conducted outside the judicial process, without prior approval by judge or magistrate, are *per se* unreasonable under the Fourth Amendment—subject only to a few specifically established and well-delineated exceptions." *Arizona v. Gant*, 556 U.S. 332, 338 (2009) (citation omitted). *See United States v. Mundy*, 621 F.3d 283, 287 (3d Cir. 2010).

Defendants contend that they searched the glove compartment of the vehicle to obtain Mucy's insurance information to complete their police report. (Nagy Dep. 25:8-12; Webb Dep. 41:10-11.) However, they do not explain how this search constituted a recognized exception to the warrant requirement.[7] Moreover, at his deposition, Nagy acknowledged that they could have asked Mucy for his insurance information while speaking to him on the phone. (Nagy Dep. 26:6-27:17.) This would have obviated any need to search the vehicle at all. Thus, as to this issue, Mucy has demonstrated that the search was not permissible under the Fourth Amendment.

Even if Defendants had a basis for the initial search, however, the continued search of the

---

[7] As discussed below, "one exception to the warrant requirement is for inventory searches of lawfully seized automobiles." *United States v. Mundy*, 621 F.3d 283, 287 (3d Cir. 2010). However, Defendants do not contend that they seized the vehicle at this point or that the initial search constituted an inventory search. Thus, this exception would not apply.

vehicle was improper. Defendants argue that, once they found a gun near the glove compartment, they proceeded to search the rest of the vehicle, including the locked trunk, to "safeguard" Mucy's belongings. Nagy described this as an "inventory search." (Nagy Dep. 32:7-14.)

The Supreme Court has held that, *after* police have impounded a vehicle, they may engage in a search of it pursuant to "standardized procedures" to inventory the contents of the vehicle pursuant to their "community caretaking" function. *Colorado v. Bertine*, 479 U.S. 367, 372-73 (1987). With respect to impoundment of a vehicle, the Third Circuit has adopted the reasonableness test and held that "the constitutionality of a community caretaking impoundment" under the Fourth Amendment is judged by focusing on the reasonableness of the impoundment for a community caretaking purpose. *United States v. Smith*, 522 F.3d 305, 312-15 (3d Cir. 2008) (citing *United States v. Coccia*, 446 F.3d 223, 239 (1st Cir. 2006)). Reasonableness of the removal turns on "all the facts and circumstances of the case." *United States v. Miller*, 662 F. App'x 169, 172 (3d Cir. 2016) (quoting *South Dakota v. Opperman*, 428 U.S. 364, 375 (1976)). The "reasonableness analysis does not hinge solely on any particular factor." *Coccia*, 446 F.3d at 239. *See Miller*, 662 F. App'x at 172; *United States v. Hawkins*, 646 F. App'x 254, 257 n.4 (3d Cir. 2016).

There are multiple issues with Defendants' argument that the extended search of the vehicle constituted an inventory search. First, Defendants indicate that they searched the vehicle *before* they impounded it, which would turn the definition of an inventory search on its head. "An inventory search is the search of property lawfully seized and detained, in order to ensure that it is harmless, to secure valuable items (such as might be kept in a towed car), and to protect against false claims of loss or damage." *Wren v. United States*, 517 U.S. 806, 812 n.1 (1996) (citing *Opperman*, 428 U.S. at 369). *See also United States v. Snoddy,* 976 F.3d 630, 634 (6th

Cir. 2020) ("A vehicle is lawfully seized and, thus, subject to an inventory search if it is lawfully impounded."), *cert. denied,* 141 S. Ct. 1430 (2021); *United States v. Lynch*, 290 F. Supp. 2d 490, 499 (M.D. Pa. 2003) ("To show the lawfulness of a vehicle inventory search, the government must first establish that the vehicle was lawfully in police custody."), *aff'd*, 214 F. App'x 248 (3d Cir. 2007); *Commonwealth v. Lagenella*, 83 A.3d 94, 106 (Pa. 2013) (when police did not have a legal basis to tow vehicle, they could not perform an inventory search of it either); *Commonwealth v. Hennigan*, 753 A.2d 245, 255 (Pa. Super. 2000) ("An inventory search of an automobile is permitted where: (1) the police have lawfully impounded the automobile; and (2) the police have acted in accordance with a reasonable, standard policy of routinely securing and inventorying the contents of the impounded vehicle.")

In *United States v. Abbott*, 584 F. Supp. 442 (W.D. Pa.), *aff'd mem.*, 749 F.2d 28 (3d Cir. 1984), the court indicated that:

> Logically, since an inventory search is to protect the owner's property, the owner, whenever available, should be given the opportunity to determine how he wants his property secured. The Supreme Court has implicitly embraced the view:
>
> > that it should only be in the atypical case that police officers would find it necessary to conduct a general inventory search of an impounded vehicle. The owner of the property may be able to take reasonable steps to safeguard his property at the time of arrest, thus obviating the necessity of impoundment .... [I]t is only reasonable that the owner be allowed to choose whether or not he wishes his car impounded. In cases where the owner or operator cannot make his wishes known ... the property would be adequately safeguarded by rolling up the windows and locking the doors, subject, of course, to reasonable steps to safeguard property in plain view within the automobile.

*Id.* at 448-49 (quoting *United States v. Lawson*, 487 F.2d 468, 477 (8th Cir. 1973)).

Defendants claim that because they were called away to another incident that evening, they were unable to return Mucy's firearms and ammunition to him. However, as Mucy notes, he

suggested that the troopers could drop these items off at his house while on their way to another incident, but they did not do so or arrange for any other process by which he could retrieve his property. Instead, they held this property for a month. Thus, as to this issue, Mucy has demonstrated that the search and seizure were not permissible under the Fourth Amendment.

Courts that have found police impoundments to be proper have cited concerns about the vehicle "impeding traffic" or posing "a threat to public safety." See *Miller*, 662 F. App'x at 172 (police appropriately towed vehicle when there was a gun that was visible from outside the truck, there was no one to drive it and it was in a crime-prone area); *Smith*, 522 F.3d at 313-14 (police had arrested the occupants of the car and they did not want to leave it in a high-crime area).

Here, there is no evidence that Mucy's vehicle, in which no firearms were visible, which was parked in a Walmart parking lot with the tenant's knowledge and was about to be towed by a towing company was impeding traffic or posing a threat to public safety. Thus, there was no basis to impound the vehicle. Moreover, the Third Circuit has held that while law enforcement personnel have some discretion to conduct vehicle searches, it is "only where there is evidence of a policy or regulation sufficiently limiting the scope of that discretion." *United States v. Bradley*, 954 F.3d 551, 558 (3d Cir. 2020). Here, Defendants point to no policy or regulation limiting the scope of their discretion. *See Pitts v. Delaware*, 646 F.3d 151, 156 (3d Cir. 2011) (jury would have to weigh testimony to determine whether police had probable cause for towing and searching the plaintiff's car); *Watley v. Felsman*, 839 F. App'x 728, 731 (3d Cir. 2020) (same).

In order to evaluate the reasonableness of an impoundment, a number of courts have cited the following non-exclusive factors identified by the Court of Appeals for the Tenth Circuit: "(1) whether the vehicle is on public or private property; (2) if on private property, whether the property owner has been consulted; (3) whether an alternative to impoundment exists (especially

13

another person capable of driving the vehicle); (4) whether the vehicle is implicated in a crime; and (5) whether the vehicle's owner and/or driver have consented to the impoundment." *United States v. Sanders*, 796 F.3d 1241, 1250 (10th Cir. 2015). *See, e.g., Rosemont Taxicab Co. v. Philadelphia Parking Auth.*, 327 F. Supp. 3d 803, 819 (E.D. Pa. 2018).

None of these factors are present here. The vehicle was on Walmart's property and someone associated with Walmart was consulted; an alternative to impoundment existed in the form of a tow truck driver who was already on the scene; the vehicle was not implicated in a crime; and the troopers did not ask Mucy if he consented to the impoundment.[8]  Nor have Defendants cited to any other basis that would require impoundment.

Defendants have not cited—and this Court has not found—a case in which under the circumstances present here, the police would be lawfully authorized to impound it. Thus, neither the extended search of the vehicle nor the impoundment of it can be accurately described as an inventory search.

In the alternative, Defendants suggest that the vehicle was towed away "as part of the investigation."  However, they have not explained what this means: there was no other person or vehicle involved, so even assuming that they intended to issue traffic citations, there was no reason to take the vehicle into police custody. While they spoke to Mucy again the next day, there is no record evidence that they conducted any further investigation that involved the vehicle. Thus, as to this issue, Mucy has demonstrated that the seizure of the vehicle was not

---

[8] The Pennsylvania Vehicle Code contains a section providing for circumstances when police may order the removal of a vehicle, such as when it is obstructing traffic, the person in charge of it is physically unable to provide for its custody and removal, or the driver "is arrested for an alleged offense for which the officer is required by law to take the person arrested before an issuing authority without unnecessary delay." 75 Pa. C.S. § 3352. None of those circumstances apply here. *See Commonwealth v. Hennigan*, 753 A.2d 245, 256 (Pa. Super. 2000) ("where a defendant is stopped on the highway for a summary offense, the police have no statutory authority to impound the defendant's vehicle.")

permissible under the Fourth Amendment.

Finally, Defendants kept Mucy's vehicle, firearms and ammunition for thirty days before he could retrieve them. While Nagy did not recall receiving any calls from Mucy requesting the return of the property, Defendants do not refute Mucy's statements that that he made repeated calls to reclaim his property and received no response.

As Mucy notes, even a seizure that is reasonable at its inception may become unreasonable as a result of its duration. *See Segura v. United States*, 468 U.S. 796, 812 (1984). In considering whether a delay was reasonable, the court should weigh the "nature and quality of the intrusion on the individual's Fourth Amendment interests against the importance of the governmental interests alleged to justify the intrusion." *United States v. Place*, 462 U.S. 696, 703 (1983).

Defendants kept Mucy's property for approximately one month and offer no basis for having done so. As Mucy notes, they admit that once citations were issued on December 22, 2018, the investigation was complete. Therefore, even if the original seizure had been lawful, Mucy has shown that Defendants were not justified in keeping his property for a month.

 For these reasons, Mucy's motion for partial summary judgment with respect to Count VI will be granted.

C.  **Defendants' Motion for Partial Summary Judgment**

Defendants seek summary judgment with respect Mucy's retaliation claim and the state law claim of malicious prosecution in Counts I and VII of the Amended Complaint, respectively.

1.  First and Fifth Amendment Retaliation Claims

Mucy asserts claims under the First Amendment, which prohibit retaliation for an

individual's exercise of his rights to free speech and the Fifth Amendment, which protects the right to remain silent when confronted with a police investigation. Mucy alleges that, when he refused to return to the scene of the accident the night that  it occurred, Defendants retaliated against him for exercising these rights by searching and seizing his vehicle and firearms, filing wrongful citations against him and making false statements to County officials that resulted in his suspension.

A claim of retaliation for the exercise of First Amendment rights requires a constitutionally protected activity, retaliation against the plaintiff by a governmental entity and a causal relationship between the protected activity and the retaliation. *Eichenlaub v. Township of Indiana*, 385 F.3d 274, 282 (3d Cir. 2004). The same elements apply to a Fifth Amendment retaliation claim. *Feliciano v. Dohman*, 645 F. App'x 153, 155 (3d Cir. 2016).

Defendants do not dispute that Mucy's speech (or refusal to speak) is entitled to protection, that the issuance of citations could constitute "retaliatory action sufficient to deter a person of ordinary firmness from exercising his constitutional rights," or that the temporal proximity between these events could be sufficiently suggestive to support a causal link. *See Farmer v. Decker*, 353 F. Supp. 3d 342, 353-54 (M.D. Pa. 2018). However, they contend that they are entitled to summary judgment on Mucy's claims because the initial search of the vehicle was for the purpose of obtaining insurance information, Nagy had probable cause to issue the citations, and Mucy has not proffered any evidence that Nagy had a retaliatory motive for contacting County officials.

The Supreme Court has held that "the First Amendment protects a significant amount of verbal criticism and challenge directed at police officers." *City of Houston, Tex. v. Hill*, 482 U.S. 451, 461 (1987). Moreover, as the Court of Appeals for the Third Circuit has held, "official

retaliation for the exercise of *any* constitutional right creates an actionable claim under Section 1983." *Anderson v. Davila*, 125 F.3d 148, 162 (3d Cir. 1997). *See also White v. Napoleon*, 897 F.2d 103, 111-12 (3d Cir. 1990).

As stated by the Supreme Court, "the right of freedom of thought protected by the First Amendment against state action includes both the right to speak freely and the right to refrain from speaking at all." *Wooley v. Maynard*, 430 U.S. 705, 714 (1977) (citation omitted). With respect to the Fifth Amendment, "this prohibition not only permits a person to refuse to testify against himself at a criminal trial in which he is a defendant, but also privileges him not to answer official questions put to him in any other proceeding, civil or criminal, formal or informal, where the answers might incriminate him in future criminal proceedings." *Minnesota v. Murphy*, 465 U.S. 420, 426 (1984).

Additionally, in a case of a retaliatory prosecution, a plaintiff must allege and prove "an absence of probable cause to support the underlying criminal charge." *Hartman v. Moore*, 547 U.S. 250, 252 (2006); *see also Miller v. Mitchell*, 598 F.3d 139, 153-54 (3d Cir. 2010) (probable cause requirement applies even where the same individual acted as both investigator and prosecutor, and even where the individual made "explicit" retaliatory threats).

More recently, relying upon the rationale of *Hartman*, the Supreme Court held that a plaintiff who asserts a retaliatory arrest claim based on speech protected by the First Amendment generally must plead and prove the absence of probable cause for the arrest. *See Nieves v. Bartlett*, 139 S. Ct. 1715 (2019).[9] Although the Court was not addressing the context of a "retaliatory citation," courts have applied the standard to this situation. *See Favata v. Seidel*, 511

---

[9] The Court carved out a narrow exception "for circumstances where officers typically have probable cause to make arrests, but typically exercise their discretion not to do so." *Id.* at 1727. Mucy makes no argument that the exception would apply in this case.

F. App'x 155, 158-59 (3d Cir. 2013) (motorist who displayed his middle finger to driver of another vehicle and who claimed that he was issued a citation for disorderly conduct in retaliation lost on summary judgment because state trooper had probable cause to issue this citation); *Farmer*, 353 F. Supp. 3d at 352 & n.9 (event attendee who engaged in a verbal confrontation with a woman at the event and was issued a citation for disorderly conduct in retaliation lost on summary judgment because state trooper had probable cause to issue the citation); *Credico v. W. Goshen Police*, 2013 WL 6077168, at *4 (E.D. Pa. Nov. 18, 2013) (man who approached police in cemetery and raised a middle finger while shouting at them could not maintain a claim for retaliation because police had probable cause to issue him a citation for disorderly conduct), *aff'd*, 574 F. App'x 126 (3d Cir. 2014). Neither party has provided any basis not to apply this standard in this case.[10]

### a.  Search of Vehicle

Mucy first claims that Defendants retaliated against him for not returning to the scene by searching his vehicle and seizing his firearms. As explained above, Defendants contend that they searched the glove compartment of the vehicle to obtain Mucy's insurance information to complete their police report, but they do not explain how this search constituted a recognized exception to the warrant requirement.[11] Moreover, at his deposition, Nagy acknowledged that they could have asked Mucy for his insurance information while speaking to him on the phone. Thus, as to this issue, Defendants have not demonstrated that the search was permissible under

---

[10] Mucy does not address the issue of probable cause in discussing the retaliation claims but does address it in discussing the state law malicious prosecution claim. Defendants "contend that *Nieves* arguably would not apply because Plaintiff was not subject to an arrest," but that, because he pleads in part that he was subjected to a retaliatory prosecution, he "must still prove absence of probable cause." (ECF No. 36 at 3 n.2.)

[11] Defendants do not seek summary judgment with respect to the other searches and seizures in this case.

the Fourth Amendment. Indeed, for the reasons explained above, Mucy has demonstrated that the various searches and seizures were not permissible under the Fourth Amendment. However, regardless of whether they were lawful, the issue of whether they were conducted in retaliation for Mucy's refusal to return to the scene must be determined by the finder of fact at trial.

b.  Issuance of Citations

Defendants contend that because they had probable cause to issue six citations against Mucy, his retaliation claim based on their issuance fails as a matter of law. While the existence of probable cause is typically a question for the jury, a court may conclude "that probable cause did exist as a matter of law if the evidence, viewed most favorably to Plaintiff, reasonably would not support a contrary factual finding." *Sherwood v. Mulvihill*, 113 F.3d 396, 401 (3d Cir. 1997) (footnote omitted). "The test for an arrest without probable cause is an objective one, based on 'the facts available to the officers at the moment of arrest.'" *Barna v. City of Perth Amboy*, 42 F.3d 809, 819 (3d Cir. 1994) (quoting *Beck v. Ohio*, 379 U.S. 89, 96 (1964)). *See Favata*, 511 F. App'x at 159 (applying this standard to a situation involving the issuance of a citation).

As discussed below, disputed issues of fact preclude summary judgment in Defendants' favor with respect to the issuance of the citations that were issued.

*1)  Reporting an Accident*

Mucy was cited for two related provisions of the Pennsylvania Vehicle Code regarding the reporting of an accident:

(a) General rule.--The driver of any vehicle involved in an accident resulting in injury to or death of any person or damage to any vehicle or other property which is driven or attended by any person shall give his name, address and the registration number of the vehicle he is driving, and shall upon request exhibit his driver's license and information relating to financial responsibility to any person injured in the accident or to the driver or occupant of or person attending any vehicle or other property damaged in the accident and shall give the information and upon request exhibit the license and information relating to financial

responsibility to any police officer at the scene of the accident or who is investigating the accident and shall render to any person injured in the accident reasonable assistance, including the making of arrangements for the carrying of the injured person to a physician, surgeon or hospital for medical or surgical treatment if it is apparent that treatment is necessary or if requested by the injured person.

…

(a) General rule.--The driver of a vehicle involved in an accident shall immediately by the quickest means of communication give notice to the nearest office of a duly authorized police department if the accident involves:

(1) injury to or death of any person; or

(2) damage to any vehicle involved to the extent that it cannot be driven under its own power in its customary manner without further damage or hazard to the vehicle, other traffic elements, or the roadway, and therefore requires towing.

75 Pa. C.S. §§ 3744(a), 3746(a).

Pennsylvania courts have held that "in any case of an accident which does not involve damage to another's vehicle or property or injury or death, [these provisions] create no duty to report the accident to the police." *Commonwealth v. Edwards*, 513 A.2d 445, 447 (Pa. Super. 1986) (officer's suspicion that driver might not have reported an accident based on his observation of fresh damage to the vehicle was not a reasonable suspicion and did not justify stopping the vehicle for violating these provisions).

As the undisputed facts demonstrate, this accident did not result in damage to another vehicle or property or injury or death.[12] However, the parties dispute whether Mucy's vehicle could have been "driven under its own power in its customary manner" or required towing. Mucy did not give notice of the accident to a police department, which is required if the vehicle must be towed. Thus, whether Defendants had probable cause to cite Mucy must be determined

---

[12] Nagy testified that he believed that, if an individual is involved in a "reportable crash," then "the operator is required to stay at the scene." (Nagy Dep. 35:14-16.) That is not what the statutes provide.

by the jury.

### 2)  Driving on Roadways Laned for Traffic

Mucy was also cited for violating the following provision:

(1) Driving within single lane.--A vehicle shall be driven as nearly as practicable entirely within a single lane and shall not be moved from the lane until the driver has first ascertained that the movement can be made with safety.

75 Pa. C.S. § 3309. Mucy informed Defendants that his vehicle hydroplaned in the rain and came to rest on the wrong side of the road, but he immediately moved it to the proper side. Defendants did not witness the accident, but were told that Mucy's car left the lane in which he was traveling, after which he returned it to appropriate lane.

Courts have held that: "Excused violations are those that provide legal justification for an act, such as an involuntary action or a sudden emergency, or those that cannot be prevented, such as weather conditions." *Commonwealth v. Meredith*, 2014 WL 10920307, at *2 (Pa. Super. May 7, 2014). *See also Commonwealth v. Fierst*, 620 A.2d 1196, 1202 (Pa. Super. 1993) ("the Pennsylvania Crimes Code does not impose criminal liability on a person for an involuntary act.") While Mucy stated that that the vehicle left the road because of weather conditions, Nagy concluded, as discussed below, that this occurred due to careless or reckless driving, not because of weather conditions or an emergency. Thus, whether Nagy's conclusion supports a finding of probable cause cannot be determined based upon the record and must be submitted to the fact finder.

### 3)  Careless and Reckless Driving

Mucy was cited for two related offenses, careless and reckless driving:

(a) General rule.--Any person who drives a vehicle in careless disregard for the safety of persons or property is guilty of careless driving, a summary offense.

***

21

> (a) General rule.--Any person who drives any vehicle in willful or wanton disregard for the safety of persons or property is guilty of reckless driving.

75 Pa. C.S. §§ 3714, 3736.

Defendants contend that they had probable cause to cite Mucy for violating these provisions because they drove along the same section of road that evening but their car did not spin off the road, nor did they encounter any other crashes. (Nagy Dep. 77:8-78:3.) Therefore, they assert that Mucy "must have been driving carelessly and recklessly."

Courts have held that the "*mens rea* requirement applicable to § 3714, careless disregard, implies less than willful or wanton conduct but more than ordinary negligence or the mere absence of care under the circumstances." *Commonwealth v. Gezovich*, 7 A.3d 300, 301 (Pa. Super. 2010). The same standard applies to reckless driving. *Id.* at 301 n.1. Moreover, it is "well established that the mere occurrence of an accident does not prove negligence." *Id.* at 302 (citations omitted). Thus, in *Gezovich*, when a state trooper did not witness a collision, the mere fact that the defendant was unable to stop her vehicle in time to avoid striking the rear of the vehicle in front of her did not establish that she engaged in careless driving.

Defendants did not witness the accident. However, they saw the damage to Mucy's car, which they believed to render it inoperable. They traveled the same stretch of road without incident. They were told that Mucy's car left the roadway, traveled up an embankment and ended up on the other side of the road. Mucy denies that he was driving in an unsafe manner, and blames the accident on hydroplaning. Whether this evidence is sufficient to establish probable cause for careless or reckless driving cannot be determined based on these disputed facts, and thus, will be up to the jury to decide whether there was probable cause to cite Mucy.

### 4) *Driving at a Safe Speed*

The final citation is for driving at an unsafe speed:

> No person shall drive a vehicle at a speed greater than is reasonable and prudent under the conditions and having regard to the actual and potential hazards then existing, nor at a speed greater than will permit the driver to bring his vehicle to a stop within the assured clear distance ahead. Consistent with the foregoing, every person shall drive at a safe and appropriate speed when approaching and crossing an intersection or railroad grade crossing, when approaching and going around a curve, when approaching a hill crest, when traveling upon any narrow or winding roadway and when special hazards exist with respect to pedestrians or other traffic or by reason of weather or highway conditions.

75 Pa. C.S. § 3361.

Defendants, who did not witness Mucy's driving, asssert that they had probable cause to cite him for speeding because their car did not spin off the road that evening under similar conditions. Therefore, they conclude that he must have been driving "at a speed greater than is reasonable and prudent under the conditions and having regard to the actual and potential hazards then existing."

As noted above, whether the evidence related to the nature and circumstances accident itself, damage to Mucy's vehicle and Defendants' contemporaneous observations experience on the same roadway were sufficient to establish probable cause to support a citation for speeding must be left to a determinatation by the fact finder.

### c.  Contacting County Officials

With respect to the statements to County officials, Mucy has proffered evidence that Nagy told Judge Wagner that he "fled the scene to avoid a DUI" and that this was not true. (Escalera-Rivera Dep. 13:19-20:10; Nagy Dep. 66:6-9, 67:12-13.)

Nagy did not recall making this statement but suggests that contacting Judge Wagner was the equivalent of notifying a police officer's supervisor that the officer was involved in an

accident. He cites no basis for this analogy. Moreover, he does not address evidence of record that what he told Judge Wagner was untrue and that he knew it was untrue.

"Where a reasonable inference can be drawn that an [individual's] speech was at least one factor considered by [the defendant] in deciding whether to take action against the [individual], the question of whether the speech was a motivating factor in that determination is best left to the jury." *Merkle v. Upper Dublin Sch. Dist.*, 211 F.3d 782, 795 (3d Cir. 2000) (citations omitted). On this record, a reasonable inference could be drawn that Mucy's refusal to return to the scene of the accident that evening speech was at least one factor considered by Nagy in deciding to call Judge Wagner. Therefore, the issue should be decided by the jury at trial.

As such, Defenants' motion for summary judgment with respect to Count I will be denied.

### 2.   State Malicious Prosecution Claim

Count VII alleges a state law claim of malicious prosecution against Nagy. Defendants contend that that sovereign immunity bars this claim.

"[I]n Pennsylvania, a plaintiff alleging common law malicious prosecution must show (1) the defendants initiated a criminal proceeding; (2) the criminal proceeding ended in the plaintiff's favor; (3) the proceeding was initiated without probable cause; and (4) the defendants acted maliciously or for a purpose other than bringing the plaintiff to justice." *Merkle*, 211 F. 3d at 791 (citation omitted).

With respect to sovereign immunity, under Pennsylvania law, "the Commonwealth, and its officials and employees acting within the scope of their duties, shall continue to enjoy sovereign immunity and official immunity and remain immune from suit except as the General

Assembly shall specifically waive the immunity." 1 Pa. C.S. § 2310. "Exceptions to sovereign immunity are to be narrowly construed." *Dean v. Commonwealth, Dep't of Transp.*, 751 A.2d 1130, 1134 (Pa. 2000).

As noted by the Pennsylvania Supreme Court in *Justice v. Lombardo*, 208 A.3d 1057 (Pa. 2019):

> Our intermediate appellate courts have held that these protections shield an employee of a Commonwealth agency from the imposition of liability even for intentional torts. *See LaFrankie v Miklich,* 152 Pa. Cmwlth. 163, 618 A.2d 1145, 1149 (1992). In the present case, it is undisputed that [the defendant], as an employee of the PSP, is entitled to the protections of sovereign immunity for conduct within the scope of his duties, subject only to certain exceptions not applicable here. *See* 1 Pa. C.S. § 2310; *see also* 42 Pa. C.S. §§ 8521, 522(b)(1)-(9); *LaFrankie,* 618 A. 2d at 1149. Thus, judgment could only be entered against [defendant] in this matter if he was acting outside the scope of employment…

*Id.* at 1067.[13] There are ten exceptions to sovereign immunity, none of which apply here. 42 Pa. C.S. § 8521(a), § 8522(b).

Because sovereign immunity is an affirmative defense, a defendant bears the burden of proof on this issue. *Id.*; *see also Justice*, 208 A.3d at 1068. Where the facts and inferences to be drawn from the facts are not in dispute, the court may determine the scope as a matter of law. *Justice*, *id.* On the other hand, when more than one inference can be drawn, this issue must be

---

[13] Pennsylvania intermediate courts have held that "intentional tort claims … are not within the narrow exceptions set forth in 42 Pa. C.S. § 8522(b)." *Faust v. Commonwealth Dep't of Revenue*, 592 A.2d 835, 839 (Pa. Commw. 1991). *See also Ioven v. Nestel*, 150 A.3d 571, 574 (Pa. Commw. 2016). "Even where a plaintiff asks for monetary damages against a defendant in his individual capacities, sovereign immunity applies." *Mitchell v. Luckenbill*, 680 F. Supp. 2d 672, 682 (M.D. Pa. 2010) (citation omitted). "Sovereign immunity applies to intentional and negligent torts." *Id.* (citation omitted). This differs from the statute concerning local agency employees, whose immunity is lost when their actions represent a "crime, actual fraud, actual malice or willful misconduct." 42 Pa. C.S. § 8550.

resolved by the factfinder. *Id.* (whether state trooper's conduct was for a purpose to serve the state police or "out of personal animus" was for the jury to decide).

Thus, a pivotal issue in assessing sovereign immunity is whether an employee acted within or outside the scope of his duties, which is a question of state law. Pennsylvania applies principles from the Restatement (Second) of Agency to determine if an employee's conduct is within the scope of his employment. *Justice*, 208 A.3d at 1067. *See also Brumfield v. Sanders,* 232 F.2d 376, 380 (3d Cir. 2000). As summarized in *Schell v. Guth*, 88 A.3d 1053 (Pa. Commw. 2014), the applicable criteria to resolve scope-of-employment issues are as follows:

> Conduct of an employee is within the scope of employment if it is of a kind and nature that the employee is employed to perform; it occurs substantially within the authorized time and space limits; it is actuated at least in part, by a purpose to serve the employer; and if force is intentionally used by the employee against another, it is not unexpected by the employer. (citations omitted). These criteria mirror those contained in Section 228 of the Restatement (Second) of Agency . . .

*Id.* at 1067. *See also Brumfield*, 232 F.3d at 380.

Mucy's malicious prosecution claim relates to the issuance of traffic citations, a quintessential function of the state police. "Where a state trooper is on duty and investigating a crime throughout the duration of the alleged offenses, she is acting within the scope of her employment and sovereign immunity will require the dismissal of state law claims against her." *DeForte v. Borough of Worthington*, 364 F. Supp. 3d 458, 487 (W.D. Pa. 2019) (citing *Mitchell*, 680 F. Supp. 2d at 683), *aff'd*, 844 F. App'x 511 (3d Cir. 2021). Mucy contends that the citations were issued by Nagy in retaliation for his exercise of his right to remain silent, and that Nagy lacked probable cause for the citations he issued. Thus, Mucy argues, it is disputed whether Nagy was acting within the scope of his employment.

These contentions are without merit. As an initial matter, "a mere failure to have probable cause in effectuating an arrest does not prevent the application of sovereign immunity when the

officer's actions otherwise fall within the scope of his employment." *Perkins v. Staskiewicz*, 2009 WL 693176, at *4 (M.D. Pa. Mar. 13, 2009) (citing *Pansy v. Preate*, 870 F. Supp. 612, 615-16 (M.D. Pa. 1994), *aff'd mem.*, 61 F.3d 896 (3d Cir. 1995)); *Shoop v. Dauphin Cnty.*, 766 F. Supp. 1327, 1334 (M.D. Pa.), *aff'd mem.*, 945 F.2d 396 (3d Cir. 1991)); *Pickering v. Sacavage*, 642 A.2d 555, 560 (Pa. Commw. 1994)).

In support of his position, Mucy cites *Perkins*, in which the court denied a motion to dismiss a state trooper on the ground of sovereign immunity because the plaintiff alleged that the trooper knowingly made an arrest without probable cause. 2009 WL 693176, at *4. However, at the summary judgment stage, Mucy has elicited no evidence that supports his contention that Nagy knew that he lacked probable cause for the citations he issued. On the contrary, Nagy testified in his deposition that he believed that he had probable cause to issue the citations. See Nagy Dep. 74-78. At any rate, even if Nagy engaged in willful misconduct as Mucy alleges, "state employees do not lose their immunity for intentional torts, provided that they are acting within the scope of their employment.") *Kull v. Guisse,* 81 A.3d 148, 157 (Pa. Commw. 2013) (citations omitted); *Holt v. Northwest Pa. Training P'ship Consortium, Inc.*, 694 A.2d 1134, 1140 (Pa. Commw. 1997) ("willful misconduct does not vitiate a Commonwealth employee's immunity because sovereign immunity protects a Commonwealth employee acting within the scope of his or her employment from liability.")

It is uncontroverted that the issuance of citations is the type of conduct that Nagy was employed to perform, that their issuance the next day after Nagy spoke to Mucy was within an appropriate time period and that the citations were issued, at least in part, by a purpose to serve Nagy's employer, the Pennsylvania State Police. Thus, even if it is determined at trial that Nagy lacked probable cause to issue traffic citations to Mucy, he was acting within the scope of his

employment. As such, sovereign immunity bars the malicious prosecution claim alleged against him.

Therefore, with respect to Count VII, the motion for summary judgment will be granted.

**IV.     Conclusion**

For the reasons explained above, Plaintiff's motion for partial summary judgment (ECF No. 39) will be granted. Defendants' motion for partial summary judgment (ECF No. 35) will be granted with respect to Count VII and denied with respect to Count I.

Appropriate orders will follow.


Dated: January 30, 2023                              BY THE COURT:

                                                     /s/Patricia L. Dodge_____
                                                     PATRICIA L. DODGE
                                                     United States Magistrate Judge